# UNITED STATES DISTRICT COURT
# DISTRICT OF MARYLAND

| | |
|---|---|
| JEAN FANORD,<br><br>    Plaintiff,<br><br>    v.<br><br>WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY,<br><br>    Defendant. | Civil Action No. TDC-14-3973 |

## MEMORANDUM OPINION

Plaintiff Jean Fanord is a former employee of Defendant Washington Metropolitan Area Transit Authority ("WMATA") who was terminated from his position and is now suing WMATA under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e–2000e-17 (2012), for alleged religious and national origin discrimination. Presently pending before the Court is WMATA's Motion for Summary Judgment. Having reviewed the briefs and submitted materials, the Court finds no hearing necessary. *See* D. Md. Local R. 105.6. For the reasons set forth below, WMATA's Motion for Summary Judgment is GRANTED.

## BACKGROUND

Fanord is from Haiti and is Christian. On April 29, 2013, he was offered a position with WMATA as a full-time Automatic Train Control ("ATC") Mechanic Helper, a position that required him to perform routine maintenance on electronic, electrical, electro-mechanical, and mechanical equipment. As a new hire, he was required to undergo a 90-day probationary period.

Fanord began his employment with WMATA on June 3, 2013 at WMATA's Greenbelt Metro Station. Fanord was assigned to the 10:30 p.m. to 6:30 a.m. shift and reported to

Sintayehu Negash, his Shift Supervisor. Fanord first met Negash on June 10, 2013. According to Fanord, during that meeting, Negash asked him where he was from. When Fanord told Negash that he was from Haiti, Negash asked him if he was Muslim. In response, Fanord told Negash that he was Christian, at which point the conversation ended. Fanord asserts that from that day forward, he had problems with Negash, specifically that if Fanord asked Negash questions, Negash responded negatively, appearing to believe that Fanord was challenging his authority.

In his position, Fanord was at times required to go into the Metro train tunnels. Employees working in the tunnels are issued personal protection equipment ("PPE"), which may include such items as a hard hat, a safety vest, safety eyewear, safety footwear, and a flashlight. According to WMATA, its policy is to not issue such equipment to probationary employees, even when such employees are posted to locations where PPE would otherwise be provided. Fanord asserts that when he was required to go into the tunnels, he was provided with only a safety vest, even though other employees were also given a flashlight and a hard hat. Fanord did not know whether the employees given the additional PPE were probationary or permanent, and he did not know of any other probationary employees working under Negash. Fanord asserts that when he asked Negash for additional safety equipment, Negash told him that the equipment was not necessary because Fanord was a probationary employee, and that each time he asked for a hard hat, Negash told him to look in the trash. At one point, Negash ordered Fanord to help clean at the Fort Totten Metro station, where there was a high-voltage rail, but did not provide him with protective gloves.

As part of his training, Fanord was expected to read various training manuals, including the "red book," a manual for Metro employees. Although Fanord was expected to read this

book, Negash never gave him a copy of it. When Fanord requested the red book from other staff members, he was informed that there was a copy on a communal bookshelf. Negash did give Fanord a copy of another manual, one dealing with cranking and blocking, and instructed him to read it. Cranking and blocking are critical functions to the ATC system. Over the course of his probationary period, Fanord read both books. Nevertheless, within the first 80 days of his employment, he was twice unable to qualify for certification in cranking and blocking. According to Fanord, Negash was supposed to train him in cranking and blocking on the job site but never did so. However, Fanord was trained in the technique by another supervisor.

On August 26, 2013, Fanord began a five-week ATC new hire familiarization class, which would run from 2:30 p.m. to 10:30 p.m. each day. On the first day of the class, he was given a basic electronics screening test, on which he scored 24 percent. Of the 20 people in the course, Fanord was one of seven to fail the exam. He and another employee had the lowest scores. Because he did not receive a passing grade, Fanord was informed that he would be required to enroll in a basic electronics remedial course and that he would be given one week to retake the proficiency exam.

The administering and grading of the exam on August 26 did not take the entire eight-hour class period. After the instructor distributed the test results, he informed those who had passed the exam that they could go home. According to Fanord, he asked the instructor whether he was to report for his 10:30 p.m. shift in Greenbelt, and the instructor informed him that he was to return to work the next day. The instructor also stated that he would be emailing Fanord's supervisor to report that Fanord had not passed the test and would need to retake the exam.

At about 11:30 p.m., Fanord received a call from Negash to ask him why he had not reported to work. The next day, when Fanord reported for his shift, Negash again asked him

why he had not reported to work the previous day. Fanord answered that he had been in class, which ran from 2:30 p.m. until 10:30 p.m. According to Fanord, in response Negash asked, "why are you lying to me, when you say that you are a Christian?" Joint Record ("J.R.") 33 (Fanord Deposition), ECF No. 29-1.

As a probationary employee, Fanord was supposed to receive written performance evaluations at the 30, 60, and 80-day marks. At the 30-day mark, Negash did the review verbally, telling Fanord only that "everything is okay, you're fine." J.R. 32. According to Fanord, Negash did not conduct a review by the 60-day mark. After confronting Fanord about his absence on August 26, 2013, Negash pulled out a written employee evaluation form and stated, "Since you are lying to me, this is what I'm going to do." J.R. 33. Fanord then gave Negash a copy of an email that established that the instructor had notified supervisors that the students were being sent home early, and that Negash had not requested that Fanord report to work that evening. When Negash saw the email, he apologized to Fanord and told him that it was "going to be much ... easier" for him to complete Fanord's performance review. *Id.*

Negash then completed Fanord's written evaluation form and included ratings for the 30, 60, and 80-day time periods. The form requires supervisors to evaluate employees in seven categories: Attendance, Technical Knowledge, Interpersonal Skills, Work Habits, Quality/Quantity of Work, Responsiveness to Supervision, and Certification and License Requirements. Employees can be given one of four ratings: an "N" for Needs Improvement, a "C" for Competent, an "E" for Exceeds, and an "O" for Outstanding. Negash gave Fanord Ns or Cs in all categories. He gave Fanord an "N" at the 30-day mark for Attendance, noting that Fanord "needed to understand midnight scheduled hours, on time." J.R. 4. When Fanord complained about this assessment, asserting that he had not missed any work during his initial

4

30-day period, Negash explained that Fanord had missed his first day, because his Monday through Friday schedule actually began on Sunday night. Fanord received an "N" for each reporting period in Technical Knowledge, with Negash noting that Fanord needed to demonstrate initiative to read the WMATA manual and to take time to understand the ATC nomenclature. He was given an "N" for the 30-day period in Work Habits, with the explanation that "instruction[s] have to be repeated." J.R. 4. For Responsiveness to Supervision, Fanord was given an "N" for the 30 and 60-day periods, without explanation. He was given a "C" for the 80-day period with the explanation that he was "a bit combative." J.R. 5. Under Certification and License Requirements, Fanord received an "N" for all reporting periods, with the notation "not ready." Id. The written evaluation form closes with a Recommendation section, where a supervisor must state whether, at the 30, 60, and 80-day marks, he recommends the employee for permanent employment based on the employee's overall performance. For each reporting period, Negash recommended Fanord for permanent employment. Negash gave Fanord a copy of his written evaluation on August 28, 2013. Although Fanord did not agree with Negash's assessments, he signed it.

Based on that evaluation, and despite Negash's recommendation that Fanord be made a permanent employee, Hernando O'Farrell, the ATC Regional Manager, decided to terminate Fanord. O'Farrell made his decision based on Fanord's score on the basic electronics screening test, his failure to certify in cranking and blocking, and the substance of his performance evaluation. Prior to making the termination decision, O'Farrell had never met Fanord and had no knowledge of his religion or national origin. On August 29, 2013, Fanord met with Truong D. Bui, the ATC Superintendent, who formally terminated him from his position. Negash, who was also present, informed Fanord that he was being terminated as a result of his low score on the

basic electronics screening test. Beyond completing the written evaluation, in which he had recommended Fanord for permanent employment, Negash had not discussed details of Fanord's performance with upper management prior to Fanord's termination.

At no point during his employment at WMATA did Fanord ask for an accommodation for his religious worship. Although Fanord believed that Negash's treatment of him was based on his national origin, at no point did Negash make derogatory remarks about Fanord's Haitian ancestry. In contrast to Fanord, Hien Bui, the other employee who had received marks as low as Fanord's score on the ATC exam, was given a permanent position. However, Bui, who worked under a different supervisor, had received Outstanding or Exceeds ratings in most categories, Competent ratings for Technical Knowledge and Certification and License Requirements, and no Needs Improvement ratings on his written evaluation. Bui also was able to complete the remedial electronics course and obtain his certification in cranking and blocking.

On February 2, 2014, Fanord filed a Charge of Discrimination with the United States Equal Employment Opportunity Commission ("EEOC"). In that Charge, he asserted that he had been discriminated against based on his religion and national origin. Fanord did not select the box for "Retaliation." In the narrative portion of the Charge, Fanord stated that Negash harassed him by regularly yelling at him, failed to provide him with necessary safety equipment, falsely accused him of lying, and questioned his religious beliefs. The EEOC issued a right-to-sue letter to Fanord on September 30, 2014. On December 19, 2014, Fanord, proceeding *pro se*, filed suit in this Court. In the Complaint, Fanord brought claims for discrimination on the basis of religion and national origin, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-4, asserting that his religious beliefs were questioned and that he was the only employee terminated for failing the ATC exam.

## DISCUSSION

Construing Fanord's Complaint as asserting claims for discriminatory discharge based on religion and national origin, WMATA asserts that it should be granted summary judgment because Fanord cannot show that he was discharged either because he is Christian or Haitian. Fanord contends that there are material disputes of fact that preclude summary judgment. Fanord also argues that WMATA should not be granted summary judgment because it has not addressed what he asserts are his additional claims of a hostile work environment, retaliation, and religious discrimination based on a failure to accommodate.

### I. Legal Standard

Under Federal Rule of Civil Procedure 56(a), the Court grants summary judgment if the moving party demonstrates that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In assessing the Motion, the Court must believe the evidence of the nonmoving party, view the facts in the light most favorable to the nonmoving party, and draw all justifiable inferences in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

The nonmoving party has the burden to show a genuine dispute on a material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986). "A material fact is one that might affect the outcome of the suit under the governing law." *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 183 (4th Cir. 2001) (quoting *Anderson*, 477 U.S. at 248). A dispute of material fact is only "genuine" if sufficient evidence favoring the nonmoving party exists for the trier of fact to return a verdict for that party. *Anderson*, 477 U.S. at 248–49.

## II. Exhaustion of Administrative Remedies

WMATA argues that Fanord never alleged in the Complaint claims for failure to accommodate his religious beliefs or for retaliation, and that even if his Complaint could be construed to contain such claims, they must be dismissed because those claims were not included in his EEOC Charge of Discrimination. Before filing suit under Title VII, a plaintiff is required to file an administrative charge of discrimination with the EEOC. 42 U.S.C. § 2000e–5(f)(1). The "EEOC charge defines the scope of the plaintiff's right to institute a civil suit." *Bryant v. Bell Atl. Md., Inc.*, 288 F.3d 124, 132 (4th Cir. 2002). The EEOC Charge must contain allegations "sufficiently precise to identify the parties, and to describe generally the actions or practices complained of." *Chacko v. Patuxent Institution*, 429 F.3d 505, 508 (4th Cir. 2005) (quoting 29 C.F.R. §1601.12(b) (2004)). If the claims asserted in a civil action "exceed the scope of the EEOC charge and any charges that would naturally have arisen from an investigation thereof, they are procedurally barred." *Id.* at 509. Under this standard, even if Fanord's Complaint were construed to contain a claim for religious discrimination based on a failure to accommodate or a claim for retaliation, both claims would have to be dismissed for failure to exhaust administrative remedies.

An employer fails to accommodate an employee's religious beliefs in violation of Title VII when (1) an employee has a bona fide religious belief that conflicts with an employment requirement, (2) the employee informs the employer of this belief, and (3) the employee is disciplined for failing to comply with the conflicting employment requirement. *Chalmers v. Tulon Co. of Richmond*, 101 F.3d 1012, 1019 (4th Cir. 1996). In his EEOC Charge, Fanord made no mention of any conflict between his religious beliefs and his employment requirements, detailed no requests he made for a religious accommodation, and alleged no discipline meted out

as a result of a conflict between his religious beliefs and his employment obligations. With no sign of a claim of religious discrimination based on a failure to accommodate present in Fanord's EEOC Charge, there would have been no reason for the EEOC investigation to have encompassed any such claim. That claim is therefore beyond the scope of the Charge and thus is procedurally barred. *Chacko*, 429 F.3d at 509.

As for retaliation, Fanord did not check the box for "Retaliation" on his EEOC Charge. Notably, "a claim in formal litigation will generally be barred if the EEOC charge alleges discrimination on one basis, such as race, and the formal litigation claim alleges discrimination on a separate basis, such as sex." *Jones v. Calvert Grp., Ltd.*, 551 F.3d 297, 300 (4th Cir. 2009) (finding no exhaustion of age, sex, or race discrimination claims when only the retaliation box was checked on the EEOC Charge); *Bryant*, 288 F.3d at 132–33 (finding no exhaustion of retaliation, color, and sex discrimination claims where the EEOC charge and investigation related only to race discrimination). Although the check boxes are not necessarily dispositive on this issue, in order for Fanord to have raised a claim of retaliation, he must at least have alleged relevant facts in the narrative description on the EEOC Charge form. *See Chacko*, 429 F.3d at 509 ("[T]he factual allegations made in formal litigation must correspond to those set forth in the administrative charge."). He did not. Fanord made no assertion that he was subjected to any sort of retaliation whatsoever, nor did he mention any protected activities prior to his termination—such as filing an internal complaint—that could serve as the trigger for a retaliation claim. *See Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 281 (4th Cir. 2015) (stating that employees engage in a protected activity for purposes of a retaliation claim when they file formal discrimination complaints or when they "complain to their superiors" about suspected unlawful discrimination (quoting *Bryant v. Aiken Reg'l Med. Ctrs. Inc.*, 333 F.3d 536, 543–44 (4th Cir.

2003)). There is an exception to this exhaustion requirement for alleged retaliation in response to the filing of an EEOC Charge. *See Nealon v. Stone*, 958 F.2d 584, 590 (4th Cir. 1992). That exception is irrelevant here because Fanord filed his Charge after he had already been terminated. Fanord's belated claim of retaliation is thus procedurally barred because it is beyond the scope of his EEOC Charge.

### III. Religious and National Origin Discrimination

Under Title VII, a claim of discriminatory treatment must be based on an adverse employment action. *See Coleman v. Md. Court of Appeals*, 626 F.3d 187, 190 (4th Cir. 2010) *aff'd on other grounds*, 132 S. Ct. 1327 (2012) (stating that the elements of a *prima facie* case of discrimination under Title VII include an adverse employment action). Although Fanord claims that the failure to provide him with manuals and safety equipment constituted religious or national origin discrimination, such allegedly disparate treatment does not constitute an adverse employment action that could support a Title VII claim. *See Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998) (defining an adverse employment action under Title VII as a "significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits"). The only adverse employment action identified by Fanord is his termination. The Court therefore considers whether Fanord has put forth sufficient evidence to create a genuine issue of material fact on whether his termination was based on religious and national origin discrimination.

Title VII makes it unlawful for an employer "to discharge any individual . . . because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). To evaluate Title VII claims, courts apply the burden-shifting scheme outlined in *McDonnell*

*Douglas Corporation v. Green*, 411 U.S. 792 (1973). *See Adams v. Trs. of the Univ. of N.C.-Wilmington*, 640 F.3d 550, 558 (4th Cir. 2011). Thus, the burden is first on the plaintiff to establish a *prima facie* case of discrimination. *Id.* (citation omitted). Once the plaintiff establishes a *prima facie* case, the burden shifts to the employer to assert a "legitimate, nondiscriminatory reason" for the allegedly discriminatory conduct. *Id.* (quoting *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 285 (4th Cir. 2004)). If the employer makes that showing, the burden shifts back to the plaintiff to demonstrate that the employer's purported reasons are a "pretext for discrimination." *Id.* at 558–59 (quoting *Hill*, 354 F.3d at 285).

To establish a *prima facie* case of discriminatory discharge, a plaintiff must show (1) that the plaintiff is a member of a protected class, (2) that the plaintiff suffered from an adverse employment action; (3) that at the time the employer took the adverse employment action, the plaintiff was performing at a level that met the employer's legitimate expectations; and (4) that the position was later filled by a similarly qualified applicant outside the protected class. *King v. Rumsfeld*, 328 F.3d 145, 149 (4th Cir. 2003). Where the plaintiff alleges discriminatory discharge based on his religious beliefs, the test has been slightly modified, requiring a *prima facie* showing that the plaintiff was (1) subjected to an adverse employment action, (2) that at the time the adverse action was taken, the plaintiff was performing his job satisfactorily, and (3) that there is some additional evidence to support the inference that the employment action was motivated by the plaintiff's failure to hold or follow the employer's religious beliefs. *Shapolia v. Los Alamos Nat. Labs.*, 992 F.2d 1033, 1038 (10th Cir. 1993); *Yancey v. Nat'l Ctr. on Inst. and Alternatives*, 986 F. Supp. 945, 954 (D. Md. 1997) (adopting the *Shapolia* test).

Here, there is no dispute that Fanord is a member of a protected class based on his religion or national origin. There is also no dispute that he was subjected to an adverse employment action in the form of termination. However, WMATA asserts that Fanord's claims fail because Fanord was not performing his job at a level that met his employer's legitimate expectations. On this score, WMATA is correct. Fanord's job as an ATC Mechanic Helper required him to perform routine maintenance on electronic, electrical, electro-mechanical, and mechanical equipment, responsibilities that required him to have a working understanding of basic electronics and to be competent in the tasks of cranking and blocking. The record establishes that Fanord failed to pass a basic electronics screening test, and that he twice failed to be certified in cranking and blocking. Because the uncontradicted evidence establishes that Fanord repeatedly failed to demonstrate necessary proficiency in key job responsibilities, Fanord cannot make the requisite showing that he was performing his job satisfactorily and to his employer's legitimate expectations. Fanord therefore fails to make the necessary *prima facie* case of discriminatory discharge based on his religion or national origin.

Fanord nowhere disputes that his job performance was deficient in these respects. Instead, he asserts that his performance in other aspects of his job improved over the course of his tenure with WMATA. For example, at the 30-day mark, he was rated as Needs Improvement in Attendance, Work Habits, and Responsiveness to Supervision, but by the 80-day mark his ratings in these areas had risen to Competent. Fanord, however, cannot escape that his Technical Knowledge and Certification and License Requirements ratings remained at Needs Improvement throughout his employment, and that he was deemed "not ready" in terms of certification requirements even as of the 80-day review. Thus, Fanord has not met this element of the *prima facie* case. Finally, as to national origin discrimination, Fanord has also failed to offer evidence

that, as required for the fourth prong of a *prima facie* case, he was replaced by a similarly qualified person from outside his protected class. *See King*, 328 F.3d at 149.

Even if Fanord had established a *prima facie* case, Fanord's deficient performance qualifies as a legitimate, non-discriminatory reason for his termination. Although Fanord may believe that he had improved sufficiently to warrant continued employment, "[i]t is the perception of the decision maker which is relevant." *Evans v. Tech. Applications & Serv. Co.*, 80 F. 3d 954, 960-61 (4th Cir. 1996). Here, upper management determined that Fanord's repeated failure to demonstrate technical competency and to secure necessary certifications during his tenure at WMATA rendered his job performance deficient so as to warrant his termination at the end of his probationary period. This conclusion is supported by Fanord's test scores, lack of certification in cranking and blocking, and performance evaluation.

Fanord has not put forth evidence to support a reasonable inference that WMATA's stated reason for Fanord's termination was a pretext for discrimination. Fanord's allegations of discriminatory animus relate only to his direct supervisor, Negash. These allegations do not support a finding of pretext for two reasons. First, the allegation that Negash asked Fanord where he was from and whether he was Muslim, in this context, are insufficient to establish a discriminatory motive. Significantly, there was no evidence that Negash had negative views about Haitians or Christians. Negash's statement, "Why are you lying to me, when you say that you are a Christian?" is insufficient to support an inference of discriminatory animus, particularly where Negash, upon seeing an email establishing that Fanord had not lied about the reason he did not report on August 26, 2013, apologized to Fanord.

Second, the uncontradicted evidence establishes that O'Farrell, the supervisor who made the decision to terminate Fanord, knew nothing about Fanord's religion or national origin. In a

discriminatory termination case, the discriminatory intent ordinarily must be harbored by the decisionmaker. *See Merritt v. Old Dominion Freight Line, Inc.*, 601 F.3d 289, 300 (4th Cir. 2010) ("It is the decision maker's intent that remains crucial . . . ."). In limited circumstances, discriminatory intent can be imputed to the formal decisionmaker "when that official has no discriminatory animus but is influenced by previous company action that is the product of a like animus in someone else." *Staub v. Proctor Hosp.*, 562 U.S. 411, 417 (2011) (applying this principle to an alleged violation of the Uniformed Services Employment and Reemployment Rights Act, which "is very similar to Title VII"); *see also e.g.*, *Lobato v. New Mexico Env't Dep't*, 733 F.3d 1283, 1294-96 (10th Cir. 2013) (applying *Staub* to a Title VII national origin claim). Under this cat's paw theory of liability, evidence that a supervisor who was not the formal decisionmaker "perform[ed] an act motivated by [discriminatory] animus that [was] *intended* by the supervisor to cause an adverse employment action" could support a finding of discrimination "if that act [was] a proximate cause of the ultimate employment action." *Staub*, 562 U.S. at 422 & n.3 (footnote omitted). Here, however, not only is there no evidence that Negash engaged in such an act or participated in the termination decision, but Negash in fact recommended that Fanord be offered a permanent position. Thus, even assuming that, as is required on a motion for summary judgment, Negash made the statements about Fanord's religion and national origin as alleged by Fanord, the evidence does not support a conclusion that the performance deficiencies identified by O'Farrell in terminating Fanord were a pretext for religious or national origin discrimination.

Finally, Fanord's reference to the fact that another employee, Hien Bui, received the same score of 24 percent on the basic electronics screening test but was not terminated does not support an inference of discrimination. Even assuming that Bui was not Haitian or Christian,

14

WMATA offered evidence establishing that Bui had a different supervisor, received higher ratings in his performance evaluation, completed a remedial course, and received his cranking and blocking certification. Where Bui was not similarly situated, the fact that he was not terminated does not support the conclusion that Fanord was terminated for discriminatory reasons. *See Haywood v. Locke*, 387 F. App'x 355, 359 (4th Cir. 2010) (stating that when a plaintiff bases his claim of discrimination on a comparison to another employee, the plaintiff must show that the comparator dealt with the same supervisor, was subject to the same standards, and "engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it" (quoting *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992))). Even if a similarly situated employee from outside the protected class were treated differently, Fanord can point to no "additional tie" to a religious or national-origin motive for that decision that would support a finding of discrimination. *Adams*, 640 F.3d at 559 (holding that a comparison of qualifications by itself does not establish discrimination without an "additional tie" to a discriminatory motive). The Court will therefore grant summary judgment to WMATA on Fanord's religious and national origin discrimination claims.

## IV. Hostile Work Environment

In his Opposition to the Motion, Fanord asserts that WMATA is also not entitled to summary judgment because it has failed to assert any arguments addressing his allegations of a hostile work environment. However, in the Complaint, Fanord nowhere asserts such a claim, and he cannot assert it in the first instance on summary judgment. *See Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1314 (11th Cir. 2004) (emphasizing that the "liberal pleading standard" of Rule 8 "does not afford plaintiffs with an opportunity to raise new claims at the

summary judgment stage"); *see also Barclay White Skanska, Inc. v. Battelle Mem'l. Inst.*, 262 F. App'x 556, 563 (4th Cir. 2008) ("[P]laintiffs may not raise new claims without amending their complaints after discovery has begun." (citing *Gilmour*)).

Even if the Court were to consider Fanord's belated claim of a hostile work environment, the Court finds no genuine issue of material fact on that issue. To advance a hostile work environment claim to trial, a plaintiff must identify evidence that: (1) the plaintiff experienced unwelcome harassment; (2) the harassment was based on the plaintiff's race, color, religion, national origin, or age; (3) the harassment was sufficiently severe or pervasive to alter the conditions of employment and to create an abusive atmosphere; and (4) there is some basis for imposing liability on the employer. *Baquir v. Principi*, 434 F.3d 733, 745-46 (4th Cir. 2006). A hostile work environment exists "when the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive work environment." *Boyer-Liberto*, 786 F.3d at 277. A court's determination whether such an environment exists includes a consideration of "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)).

Here, Fanord has asserted that when he first met Negash after joining WMATA, Negash asked Fanord about his religion and his national origin; that he got upset when Fanord asked questions; that Negash did not provide Fanord with certain safety equipment, citing Fanord's status as a probationary employee; and that at times when Fanord asked for additional equipment, Fanord believed that Negash made fun of him in response, such as by suggesting he

16

look for a hard hat in the trash. Fanord also states that Negash yelled at him frequently and recounts a specific episode when Negash screamed at him that he was lying about why he had not come to work after a training class, and asked, "Why are you lying to me, when you say that you are a Christian?" J.R. 33. Negash later apologized when he saw an email establishing that Fanord had not lied.

These facts, even taken together, do not constitute harassment severe or pervasive enough to establish a hostile work environment. Negash's alleged conduct did not include any physically threatening conduct and lacked the necessary component of "discriminatory intimidation, ridicule, and insult." *Boyer-Liberto*, 786 F.3d at 277 (quoting *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993)). There is no evidence of epithets or derogatory language relating to Fanord's religion or national origin. *See, e.g., Boyer-Liberto*, 786 F.3d at 280 ("[A] reasonable jury could find that [the supervisor's] two uses of the "porch monkey" epithet . . . were severe enough to engender a hostile work environment."). Fanord recounts only sporadic clashes with Negash. The only arguably abusive interaction, when Negash accused Fanord of lying, ended with an apology by Negash. Thus, even if Fanord had properly pleaded a cause of action for a hostile work environment, he has not offered evidence sufficient support a hostile work environment claim. *See, e.g., Buchhagen v. ICF Int'l, Inc.*, 545 F. App'x 217, 219 (4th Cir. 2013) (stating that allegations of the supervisor mockingly yelling at the plaintiff in a meeting, "yelling and pounding her hands on her desk during another meeting," "repeatedly harping on a mistake" by the plaintiff, "making snide comments" to the plaintiff, "playing favorites with employees and pitting employees against each other," and "unfairly scrutinizing and criticizing" plaintiff's use of leave and lack of compliance with directives fall "far short of being severe or

pervasive enough to establish an abusive environment" (internal alterations omitted)). WMATA is therefore entitled to summary judgment on any hostile work environment claim.

## CONCLUSION

For the foregoing reasons, WMATA's Motion for Summary Judgment is GRANTED.

Date: September 1, 2017

/s/
THEODORE D. CHUANG
United States District Judge